No. 16-2071

In the
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

---

MICHIGAN STATE A. PHILIP RANDOLPH INSTITUTE; MARY
LANSDOWN; ERIN COMARTIN; DION WILLIAMS; COMMON CAUSE,

     Plaintiffs-Appellees,

v.

RUTH JOHNSON, in her official capacity as Michigan Secretary of State,

     Defendant-Appellant.

---

Appeal from the United States District Court
Eastern District of Michigan, Southern Division

---

**EMERGENCY MOTION FOR STAY ON BEHALF OF
DEFENDANT-APPELLANT**

**ACTION REQUIRED BY AUGUST 17, 2016**

---

Bill Schuette
Attorney General

Aaron D. Lindstrom
Solicitor General
Co-Counsel of Record

Denise C. Barton (P41535)
Erik A. Grill (P64713)
Adam Fracassi (P79546)
Assistant Attorneys General
Co-Counsel of Record
Attorneys for Defendant-Appellant
  Secretary of State Johnson
P.O. Box 30736
Lansing, Michigan  48909

Dated:   August 10, 2016        517.373.6434

## TABLE OF CONTENTS

Page

Table of Authorities ................................................................. iii

Introduction ...........................................................................1

Argument................................................................................3

Conclusion and Relief Requested ..........................................19

Certificate of Service ............................................................21

Designation of Relevant District Court Documents ................22

# TABLE OF AUTHORITIES

Page

**Cases**

*Burdick v. Takushi*, 504 U.S. 428 (1992)...................................................................1

*Coalition to Defend Affirmative Action v. Granholm,* 473 F.3d 237 (6th Cir. 2006).........................................................................................................................3

*Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008)....................................3

*Frank v. Walker*, 768 F.3d 744 (7th Cir. 2014) ........................................... 7, 11, 18

*League of United Latin Am. Citizens v. Perry* (*LULAC*), 548 U.S. 399 (2006)......14

*Ne. Ohio Coal. for the Homeless v. Blackwell,* 467 F.3d 999 (6th Cir. 2006) ........18

*New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345 (1977).....................15

*Ohio Council 8 American Federation of State v. Brunner,* 814 F.3d 329 (6th Cir. 2016)............................................................................................... 5, 6, 18

*Ohio State Conference of NAACP v. Husted*, 768 F.3d 524 (6th Cir. 2014).............5

*Olle v. Henry & Wright Corp*, 910 F.2d 357 (6th Cir. 1990) .................................17

*One Wisc. Inst., Inc. v. Thomsen*, No. 15-cv-324, 2016 WL 4059222, at *39 (W.D. Wisc. July 29, 2016).................................................................................4, 5

*Serv. Emps. Int'l Union Local 1 v. Husted*, 698 F.3d 341 (6th Cir. 2012)...... *passim*

*Townley v. Miller*, 693 F.3d 1041 (9th Cir. 2012)..................................................18

*Voting for Am., Inc. v. Andrade*, 488 F. App'x 890 (5th Cir. 2012).......................18

*Wesley v. Collins*, 791 F.2d 1255 (6th Cir. 1986)....................................................7

**Statutes**

52 U.S.C. § 10301(b) ........................................................................... 12, 13

2015 P.A. 268................................................................................ 1, 2, 15, 18

Voting Rights Act ............................................................................. 1, 5, 7

**Rules**

6 Cir. IOP 35(e) .................................................................................. 3, 19

Fed. R. Civ. P. 60 ............................................................................... 16, 17

Fed. R. Civ. P. 65 ...............................................................................16

## INTRODUCTION

Michigan has joined 40 other states in eliminating straight-ticket voting. The Supreme Court, in approving an election law eliminating write-in voting, stated: "It is beyond cavil that voting is of the most fundamental significance under our constitutional structure.  It does not follow, however, that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute."  *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (internal quotations and citations omitted).  The district court departed from this well-established principle when it enjoined 2015 P.A. 268—a duly enacted law that eliminated straight-ticket voting in Michigan—on equal-protection and voting-rights grounds.  P.A. 268 was signed into law on January 5, 2016, with immediate effect.  This Court must stay the district court's preliminary injunction as expeditiously as possible for the upcoming November 8, 2016 general election pending the resolution of the merits of the preliminary injunction on appeal. The issues presented here—whether Michigan's elimination of straight-ticket voting violates the Equal Protection Clause or § 2 of the Voting Rights Act (VRA)—are questions of exceptional importance, implicating the upcoming election, the validity of a democratically enacted statute, and the proper standard for § 2 cases.

The district court erred in issuing a preliminary injunction.  Plaintiffs do not have a strong or substantial likelihood of success on the merits because this is a

rational law that imposes a minimal burden on voting.  Also, the State suffered an

irreparable harm when the district court enjoined its statute, and the public

interest—in the smooth administration of elections—favors a stay.  And leaving

Michigan's statute in place would impose only a minimal burden on Plaintiffs.

Further, the district court relied on its own post-hearing internet research for news

stories that were not vetted or verified by the parties and failed to conduct an

evidentiary hearing on disputed, factual questions.

Immediate relief is necessary because the district court is treating

Defendant's emergency motion for stay as a non-emergency.  Defendant requested

an emergency briefing schedule when it filed its motion on July 29, 2016.  But the

district court has set a deadline of August 8, 2016, and a deadline of August 12,

2016 for reply briefs.  (Order, 8/3/2016, R. 34, Page ID #862.)  This leaves a

limited amount of time (approximately two weeks) in which Defendant can

exercise her right to seek any meaningful appellate review with this Court.  And

this compressed time period is not just the district court's doing: the Plaintiffs

delayed approximately six months from the passage of 2015 P.A. 268 before filing

this lawsuit.  (Compl., 5/24/2016, R. 1, Page ID # 1-24.)  Accordingly, this Court

should stay the district court's preliminary injunction for the upcoming November

8, 2016 general election.  If this panel denies the emergency motion for stay, then

the timing of the election timetable is such that Defendant will not have a realistic

opportunity to seek en banc review.  For this reason, Defendant is requesting that

the panel, on its own motion, refer this case for an initial hearing en banc.  6 Cir.

IOP 35(e).

## ARGUMENT

In *Coalition to Defend Affirmative Action v. Granholm*, this Court set out the

familiar standard for a stay pending appeal:

> [W]e consider "(1) the likelihood that the party seeking the stay will
> prevail on the merits of the appeal; (2) the likelihood that the moving
> party will be irreparably harmed absent a stay; (3) the prospect that
> others will be harmed if the court grants the stay; and (4) the public
> interest in granting the stay."  All four factors are not prerequisites but
> are interconnected considerations that must be balanced together.
> [473 F.3d 237, 244 (6th Cir. 2006) (citations omitted).]

The trial court's last-minute injunction was a serious error for at least three

reasons.

*First*, there is a substantial likelihood that Defendant will prevail on

Plaintiffs' equal-protection claim.  A claim based on a regulation that imposes the

"usual burdens of voting" is not sufficient to show an equal-protection violation.

*See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 198 (2008) (Stevens, J.).

And that is all eliminating straight-ticket voting does.  This statute impacts only the

manner of voting—not the right to vote.  Having voters actually cast a vote for

their chosen candidate—rather than blindly voting for all candidates of a party—is

the very *act* of "voting," so it cannot rationally be characterized as a "burden" on

the right to vote.  For example, in the 2012 general election in Wayne County, filling out an entire ballot would have required 79 marks; using the straight-ticket option would still have required 62 marks (because of items such as non-partisan judicial positions and ballot measures).  (Compl. Ex. 14, 5/24/2016, R. 1-15, Page ID # 288.)  Whether the number of ovals or arrows to be completed on the form of the ballot is one, five, ten, or more, filling out multiple ovals imposes a usual—not a moderate or severe—burden.  *See One Wisc. Inst., Inc. v. Thomsen*, No. 15-cv-324, 2016 WL 4059222, at *39 (W.D. Wisc. July 29, 2016) (finding that a Wisconsin statute eliminating straight-ticket voting "creates only a slight burden on the right to vote, even among populations with lower levels of educational attainment or who have less time to spend voting").  Indeed, the burden here is even smaller than the burden identified in *Crawford* as a usual burden of voting. 553 U.S. at 198 ("For most voters who need [voter identification cards], the inconvenience of making a trip to the BMV, gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting.").

Thus, as even the case upon which the district court (improperly) relied[1] correctly noted, the only question is whether this normal voting practice is

---

[1] Plaintiffs concede, and the district court acknowledged, that the case cited for their legal proposition—*Ohio State Conference of NAACP v. Husted*, 768 F.3d 524

supported by a "rational basis."  *See Ohio State Conference of NAACP v. Husted*, 768 F.3d 524, 538 (6th Cir. 2014) (hereinafter "*Husted II*") ("State regulations that do not treat similarly situated voters differently and do not burden the fundamental right to vote are assessed through rational basis review.").  It clearly survives such review.  Forty other states ban straight-ticket voting and no case anywhere has ever suggested it was unconstitutional or violative of the Voting Rights Act.  Indeed, even the recent Wisconsin district court decision invalidating numerous voting practices upheld the straight-ticket voting ban, because it "creates only a slight burden on the right to vote, even among populations with lower levels of educational attainment or who have less time to spend voting."  *One Wisc. Inst., Inc.*, 2016 WL 4059222, at *39.  Thus, instead of merely reciting the *Anderson-Burdick* standard, the district court should have actually applied the rational basis test and affirmed the legitimate interests of the State of Michigan in eliminating straight-ticket voting, such as encouraging a more informed electorate and increasing the likelihood voters will vote in the portion of the ballot pertaining to non-partisan offices and proposals.

In any event, Michigan's law clearly satisfies *Anderson-Burdick*.  In *Ohio Council 8 American Federation of State v. Brunner,* 814 F.3d 329 (6th Cir. 2016),

---

(6th Cir. 2014) (discussed as *Husted II* in the district court's opinion)—has been vacated and is not binding on the court.  (Pls.' Mot. for Prelim. Inj., 05/27/2016, R. 4, n.1, Page ID # 357; Am. Op. & Order, 07/22/2016, R. 25, n. 3, Page ID # 722.)

5

this Court recognized that if the challenged voting regulations "are minimally burdensome and nondiscriminatory, a less-searching examination closer to rational basis applies, and 'the State's important regulatory interests are generally sufficient to justify the restrictions.'" *Id.* at 335 (quoting *Burdick*, 504 U.S. at 434; internal citation omitted). Examining an Ohio regulation where judges were allowed to list their party affiliation during the primary election but could not list their party affiliation on the general election ballot, *Brunner,* 814 F.3d at 332, this Court upheld the law, recognizing that Ohio's interest "in minimizing partisanship in judicial elections is sufficient to justify any *minimal* constitutional burden imposed by [Ohio's statute]." *Id*. at 340 (emphasis added). The same is true here. Michigan's law is neutral, not discriminatory—it applies to all voters, regardless of race. And Michigan has a legitimate interest in encouraging voters to make selections based on criteria other than party affiliation. The district court's decision rejecting Michigan's interest as "tenuous at best" departs widely from *Brunner* and should be stayed. (Am. Op. & Order, 7/22/2016, R. 25, Page ID # 727.)

*Second*, there is substantial likelihood that Defendant will also prevail against Plaintiffs' VRA § 2 claim (52 U.S.C. § 10101, *et seq*). The district court bootstrapped its flawed analysis of the equal-protection claim to its § 2 analysis and found a similar violation. The district court opined that eliminating straight-

ticket voting would place disproportionate burdens on African-American communities because African-Americans "are more likely to use straight party voting than white voters." (*Id.*, Page ID# 732). But the elimination of straight-ticket voting applies to all Michigan voters of all races and has never been held—in any of the other forty states that eliminated it—to violate VRA § 2. *See, e.g.*, *One Wisc. Inst., Inc.*, 2016 WL 4059222, at *49-50 (finding no voting rights violation under § 2 when straight-ticket voting was eliminated).

Contrary to the district court's erroneous legal ruling, the fact that one race disproportionately votes in a particular way obviously does not mean that a law affecting that preference violates § 2. At the threshold, § 2 does not prohibit an ordinary, race-neutral voting statute merely because it results in a statistical disparity. *Wesley v. Collins*, 791 F.2d 1255, 1260 (6th Cir. 1986); *accord Frank v. Walker*, 768 F.3d 744, 753 (7th Cir. 2014) ("Section 2(b) tells us that § 2(a) does not condemn a voting practice just because it has a disparate effect on minorities.").

The district court's expansive and unprecedented reading of the VRA should be stayed. Generally speaking, VRA § 2 prohibits two types of discrimination: vote denial and vote dilution. *Thornburg v. Gingles*, 478 U.S. 30, 43-46 (1986). A majority of § 2 cases concern vote dilution and is directed toward racial redistricting or gerrymandering case. *Id.* But this case involves neither

7

redistricting nor racial gerrymandering.  Plaintiffs claim that they "need not show that a challenged practice makes voting impossible for minorities – only that it makes voting disproportionately more burdensome."  *See* [*Husted II*,] 768 F.3d at 552."  (Br. in Supp. of Pls.' Mot. For Prelim. Inj., 05/27/2016, R. 4, Page ID # 358.)  As recently as last month, a different federal judge rejected this argument. *One Wisc. Inst., Inc.*, 2016 WL 4059222, at *49-50 (finding no voting rights violation under § 2 when straight-ticket voting was eliminated).

Indeed, even under the *vacated Husted II*—the most expansive conceivable interpretation of the § 2 "results" test—it is clear that eliminating straight-ticket voting complies with that statute.  To flunk the *Husted II* test, a voting "procedure must *impose* a discriminatory *burden*" whereby minorities "have *less opportunity* than other members of the electorate to participate in the political process and to elected representatives of their choice."  *Husted II*, 768 F.3d at 554 (emphasis added; internal quotation omitted).  Here, there is no "burden" because it is hardly burdensome to cast a vote for one's preferred candidate and minorities have precisely the *same* "opportunity" as nonminorities—all any voter has to do is fill in the oval next to the voter's desired candidate.  This is thus not a situation where the state has established certain *prerequisites* to voting—*e.g.*, photo ID or voting in a particular precinct on Election Day—that arguably disproportionally excludes minority voters because of discriminatory racial effects—*e.g.*, disproportionate

8

lack of transportation or time to get to the polls. Michigan's law only affects people *already* qualified and able to vote and present at the polling place. There is no rational argument that requiring all voters, minority or non-minority, to vote for their candidates is a *burdensome* denial that deprives minorities of an *equal* opportunity.

The conclusion that African-American voters disproportionately used the straight ticket option when it was available in no way suggests it is a burden, much less a discriminatory burden, for African-American voters to vote for all candidates under the new law. If a state were to switch from having the Democratic Party's candidates placed first on the ballot to having the Republican Party's candidates placed first, this would not impose a discriminatory burden on (overwhelmingly Democratic) African-American voters, because there is no cognizable *burden* in voting for the second-placed candidate. The same is true here.

Relatedly, there is also no rational argument that voting for all preferred candidates imposes a discriminatory burden "linked to" *race*. *Husted II*, 768 F.3d at 557. There is no basis for arguing that African-American voters as a whole are somehow less able or willing to vote for all their preferred candidates because of prior discrimination. Accordingly, even if voting for one's candidate were a "burden" under *Husted II*'s first prong, it still survives because there is no evidence that this alleged burden is "caused by or linked to 'social and historical conditions'

9

that have or currently produce discrimination against members of the protected class." *Id.* (quoting *Gingles*, 478 U.S. at 47). No present or past discrimination affects or impedes African-American voters' ability to vote in the normal way for all candidates.

Indeed, this is undisputed: because the district court could not find that past discrimination somehow burdened minorities in voting for all preferred candidates, it instead embarked on an untethered examination of whether some of the Senate Report factors mentioned in *Gingles—e.g.* racial appeals in campaigns, responsiveness to minority's needs—exist in Michigan. (Am. Op. & Order, 07/22/2016, R. 25, Page ID # 735.) But this, of course, says nothing about whether banning straight-ticket voting disproportionately burdens minority voters. Even *Husted II* said that plaintiffs must prove that the "*burden*" must be "*caused by or linked to*" past or present societal discrimination. *Husted II*, 768 F.3d at 557. Here, the alleged burden is that African-American voters have to vote without the straight party option, but no one, including the district court, suggests that there is some historical discrimination that affects the equal ability of African-American voters to so vote.

More generally, the Senate Report factors, on their face, have *nothing to do* with whether eliminating straight-ticket voting will or will not affect African-American voters, or do so disproportionately because of prior discrimination. If it

*did* disproportionately burden African-American voters, this would not be affected or ameliorated by the *absence* of racial electoral appeals; racially polarized voting, etc. Conversely, if it did *not* have such a disproportionate burden, then no such burden could be inferred from (or caused by) racial appeals, racially polarized voting, etc. The Senate Report factors thus say nothing about whether eliminating straight-ticket voting has a discriminatory result on minority voters. These factors only affect whether minorities can "*elect* their preferred representatives" in an at-large or white-majority district, *Gingles*, 478 U.S. at 63, and therefore are only relevant in "vote *dilution*" cases (*after* plaintiffs satisfy the three *Gingles* preconditions, *see id.*, at 48-51). Because this case does not involve redistricting issues, the *Gingles* three-prong test is inapposite and the related Senate Factors are "unhelpful" in resolving this Section 2 claim. *See Frank*, 768 F.3d at 754. For this reason, the district court should not have examined the Senate Factors that would normally apply to a § 2 case. *Gingles*, 478 U.S. at 45 (providing a list of typical factors that is neither comprehensive nor exclusive). This was error and warrants a stay of the district court's decision.

The district court also abused its discretion in issuing a preliminary injunction on VRA grounds because it applied the wrong test. The district court's reliance upon the vacated opinion in *Husted II* for its § 2 analysis is especially problematic in light of the fact that this opinion is the only time this Court has

applied this interpretation, and the Supreme Court has never adopted this interpretation. The proper test is laid out in the statutory language. Subsection (b) provides that subsection (a) is violated if, based on the totality of the circumstances, the political processes leading to nomination or election in the state or political subdivision are not "equally open" to participation by members of a class of citizens protected in subsection (a). 52 U.S.C. § 10301(b). There has been no showing that the political processes leading to nomination or election in this State is not equally open to participation by African-American citizens because of straight-ticket voting.

As to the factual issues, Plaintiffs' vision of long lines attributable solely to the elimination of straight-ticket voting is unsubstantiated on the record before this Court. Plaintiffs' lay and expert witnesses and reports do not establish a substantial likelihood that such events may occur. The MIT study cited by Plaintiffs states that there are numerous potential bottlenecks during the voting process, including checking in at the registration table, gaining access to booths, marking ballots, gaining access to scanners, and scanning ballots. (Compl. Ex. 2, 05/24/2016, R. 1-3, Page ID # 73.) According to the MIT study, "[a]s lines get longer, especially on Election Day, the problem voters experience becomes increasingly likely to occur at the *registration table*." (*Id.*, Page ID # 51 (emphasis added).) The study also concludes that, for both of its case studies, the most

12

effective way to eliminate lines at the polls is to reduce the amount of time spent at the registration table.  (*Id.*, Page ID # 67, 70.)  The study also points out that "there is no one, silver bullet 'fix' that will solve the problem [of long lines] in all places."  (*Id.*, Page ID # 75.)  Because there is "no one, silver bullet 'fix'" that will solve wait times at the polls—even the MIT study relied upon by Plaintiffs concede this point—it was clear error for this Court to conclude otherwise.  And even if, this Court could reach such a conclusion on this record, it does not mean that there is a substantial likelihood of success that Section 2 was violated.

Any number of factors can increase wait times—such as bottlenecks at the registration table, weather, specific candidates or issues on the ballot, or an increase in voter turnout at the polls.  This has nothing to do with proving a Section 2 claim:  which is aimed at the political processes leading to nomination or election in this State are not equally open to participation by African-American citizens. 52 U.S.C. § 10301(b).

Further, Plaintiffs allege—and the district court accepted without any evidence—that it would require millions of dollars to address the potential long lines.  But expensive voting tabulation equipment is not required.  Rather, proper management and planning, which could include the addition of inexpensive voting partitions so that more voters could vote simultaneously (once through the registration bottleneck), could address any purported increase in time necessary to

complete the ballot. And Plaintiffs' statistics are suspect in any event, because Plaintiffs' expert ignored counties that have the highest percentages of straight-ticket voting but have small minority populations.

Setting aside for the moment the fact that no actual data exists in Michigan to prove Plaintiffs' legal theory—and that they have chosen to exclude the counties with small minority populations (such as Ottawa county) but high number of straight-ticket voters—the court must still decide, based on the totality of the circumstances, whether a § 2 violation has occurred. *Gingles*, 478 U.S. at 44-45; *Johnson*, 512 U.S. at 1011; *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 429-430 (2006). The district court's reliance on self-selected data while overlooking other data was clear error. Even the district court's observation that wait times would increase "as much as forty minutes in Oakland County, which is *only* 13% African-American" does not advance Plaintiffs' theory. (Am. Op. & Order, 07/22/2016, R. 25, Page ID# 725) (emphasis added). This is further evidence that the district court's decision should be stayed.

Moreover, Plaintiffs have presented no evidence that minority neighborhoods in the 40 states that have eliminated straight-ticket voting have longer (or shorter) lines than the minority neighborhoods in the 10 states with straight-ticket voting. On the totality of the circumstances here, where the burden is minimal and the State's justifications are at least rational, no violation has

14

occurred.  Because the Plaintiffs had failed to meet the legal standard for their

claim, the district court erred in issuing an injunction, and a stay is warranted.[2]

*Third*, time is of the essence.  Enjoining a duly enacted statute passed by the

Michigan Legislature is a per se irreparable harm:  "any time a State is enjoined by

a court from effectuating statutes enacted by representatives of its people, it suffers

a form of irreparable injury."  *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (internal

quotation omitted).  Enjoining this particular statute, this close to the general

election, creates the possibility of voter confusion and runs contrary to the public's

interest in the smooth administration of elections.  This Court must stay the district

court's preliminary injunction and allow P.A. 268 to remain in effect for the

November 8, 2016 election.  Given that Defendant has a likelihood of prevailing in

upholding the Michigan statute, and that this Court will not have time to reach the

---

[2] Due to the page limit for filing this motion, Defendant has not set forth every
legal argument in support of her position, including the fact the district court failed
to conduct an evidentiary hearing before issuing a preliminary injunction on
disputed factual issues.  (Def.'s Resp. to Pl.'s Mot. for Prelim. Inj., 06/17/2016, R.
15-4, Page ID #433-489.)  For example, the district court concluded, based on
Plaintiffs' one-sided representations, that their expert, Kurt Metzger, "has really
good credentials, vast experience, and so I think his testimony or his affidavit is
reliable."  (Tr. of Hrg on Prelim. Inj., 07/14/2016, R. 26, Page ID # 756).  This
statement conflates the qualifications prong of the *Daubert* test with the reliability
prong, and fails to discuss the relevance prong.  *Daubert v. Merrell Dow Pharm.,
Inc.*, 509 U.S. 579, 589–91 (1993).  The district court erred in failing to give
Defendant a meaningful opportunity to challenge Metzger's testimony, and its
subsequent reliance on Metzger's report compounds that error so as to violate due
process.

actual merits on appeal (not just the stay factors), this Court should grant the stay to preserve the status quo until after the election.

The district court's non-emergency briefing schedule issued last week in this case underscores the need for this Court to grant a stay pending the November 2016 general election. By way of background, the district court entered an opinion and order granting preliminary injunction on July 21, 2016 (Op. & Order, 07/21/2016, R. 24, Page ID # 669-705)(Attachment 1), and amended its order on July 22, 2016. (Am. Op. & Order, 07/22/2016, R. 25, Page ID # 706-742.)(Attachment 2). Neither order complied with Fed. R. Civ. P. 65(d).

Defendant acted promptly by filing the instant appeal on July 25, 2016.[3] (Notice of Appeal, 07/25/2016, R. 27, Page ID # 795.)(Attachment 3) On July 29, 2016, Defendant filed a motion asking the district court to stay its preliminary injunction pending appeal and asking for a prompt decision. (Def.'s Mot. to Stay Prelim. Inj., 07/29/2016, R. 29, Page ID # 797.) The motion also alerted the district court that its orders failed to comply with Fed. R. Civ. P. 65 (c), (d). (*Id.*)

On August 1, 2016, notwithstanding Fed. R. Civ. P. 60(a), which requires leave of the appellate court to correct an order, the district court issued a third order for preliminary injunction. (Order, 08/01/2016, R. 30, Page ID # 835-837.)

---

[3] The district court's failure to comply with Fed. R. Civ. P. 65(d) does not deprive this Court of appellate jurisdiction. *Schmidt v. Lessard*, 414 U.S. 473 (1974); *Burgess v. Ryan*, 996 F.2d 180, 184 (7th Cir. 1993).

16

(Attachment 4).  That day, Defendant filed a supplement to her emergency motion for stay requesting that the district court strike the third order for violation of Fed. R. Civ. P. 60(a).[4]  (Def.'s Supplement to Mot. to Stay Prelim. Inj., 08/01/2016, R. 32, Page ID # 841-856.)  The next day, Defendant filed a notice of appeal of the third order.  (Notice of Appeal, 08/02/2016, R. 33, Page ID # 861.)(Attachment 5).

On August 3, 2016, the district court issued a scheduling order, the effect of which is that the motion for stay would not be fully briefed and decided until after August 12, 2016.  (Order, 08/03/2016, R. 34, Page ID # 862-863.)  On August 30, 2016, the ballots for the November 8, 2016, general election will begin being programmed, coded, and printed.  (Def.'s Resp. to Pl.'s Mot. for Prelim. Inj. Ex. 3, 06/17/2016, R. 15-4, Page ID # 483-489.)  Under the timetable recognized by the trial court, that leaves approximately two weeks (between mid-August and the end of August) for Defendant to seek appellate review—an impossible timeline under these emergency circumstances.  It is therefore clear that seeking a stay in the district court is futile.

---

[4] Pursuant to Fed. R. Civ. P. 60(a), a correction to an order may not be had without leave of this Court once an appeal has been docketed.  Also, the corrections in the third order go beyond the sort of clerical corrections permitted by the rule.  *See Olle v. Henry & Wright Corp*, 910 F.2d 357, 364 (6th Cir. 1990) (recognizing that Rule 60(a) does not permit correction of mistakes affecting the substantive rights of the parties).

The stay requested by Defendant is similar to ones that are routinely granted in similar time-sensitive elections cases. Although 2015 P.A. 268 was enacted in January 2016, Plaintiffs waited five months before the complaint was filed. This Court—and other circuits—routinely stay district-court judgments that would force election officials to depart from duly-enacted election policies close to elections. *See, e.g.*, *Frank*, 766 F.3d 755 (staying order that enjoined voter identification law); *Voting for Am., Inc. v. Andrade*, 488 F. App'x 890, 904 (5th Cir. 2012) (staying injunction against voter registration statutes); *Townley v. Miller*, 693 F.3d 1041, 1042 (9th Cir. 2012) (staying injunction against statute requiring listing "None of these candidates" on the ballot); *Serv. Emps. Int'l Union Local 1 v. Husted*, 698 F.3d 341, 346 (6th Cir. 2012); *Oh. Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008); *Ne. Ohio Coal. for the Homeless v. Blackwell*, 467 F.3d 999, 1012 (6th Cir. 2006).

The impending election deadlines cited by the district court and used by local officials to begin preparation of the ballots necessitate immediate action. Accordingly, notwithstanding the procedural and substantive errors, Defendant is not asking this Court for a remand to the district court. Instead, Defendant urges this Court to grant her request for stay.

The issues in this case are important election issues that have state-wide impact. Further, unless this case is stayed, en banc review will likely not be

available to the State of Michigan before the election, even though the State has been "enjoined by a court from effectuating statutes enacted by representatives of its people." *Maryland*, 133 S. Ct. at 3. Accordingly, if this panel is inclined to deny Defendant's motion for stay, Defendant is requesting that the panel, on its own motion, refer this case for an immediate en banc hearing. 6 Cir. IOP 35(e).

## CONCLUSION AND RELIEF REQUESTED

For the reasons set forth above, this Court should issue an immediate stay or vacatur of the injunction for the November 8, 2016, general election pending the resolution of the appeal of the preliminary injunction. In the event that this panel is inclined to deny Defendant's motion for stay, Defendant is requesting that the panel, on its own motion, refer this case for an initial hearing en banc.

Respectfully submitted,

Bill Schuette
Attorney General

Aaron D. Lindstrom
Solicitor General
Co-Counsel of Record

*s/Denise C. Barton*
Denise C. Barton (P41535)
Erik A. Grill (P64713)
Adam Fracassi (P79546)
Joseph Y. Ho (P77390)
Assistant Attorneys General
Co-Counsel of Record
Attorneys for Defendant-Appellant
  Secretary of State Johnson
P.O. Box 30736
Lansing, Michigan  48909
Dated:   August 10, 2016          517.373.6434

20

# CERTIFICATE OF SERVICE

I certify that on August 10, 2016, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record (designated below).

*s/Denise C. Barton*
Denise C. Barton (P41535)
Assistant Attorney General
Co-Counsel of Record
Attorney for Defendant-Appellant
   Secretary of State Ruth Johnson
P.O. Box 30736
Lansing, Michigan  48909

21

**DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS**

Defendant-Appellant, per Sixth Circuit Rule 28(d), 30(b), hereby designates

the following portions of the record on appeal:

| Description of Entry | Date | Record Entry No. | Page ID No. Range |
|---|---|---|---|
| Complaint | 05/24/2016 | R. 1 | 1-314 |
| Motion for Preliminary Injunction | 05/27/2016 | R. 4 | 318-377 |
| Response to Motion for Preliminary Injunction | 06/17/2016 | R. 15 | 433-489 |
| Opinion & Order | 07/21/2016 | R. 24 | 669-705 |
| Amended Opinion & Order | 07/22/2016 | R. 25 | 706-742 |
| Transcript | 07/14/2016 | R. 26 | 756 |
| Notice of Appeal | 07/25/2016 | R. 27 | 795 |
| Motion to Stay Preliminary Injunction | 07/29/2016 | R. 29 | 797-834 |
| Order | 08/01/2016 | R. 30 | 835-837 |
| Supplemental Motion for Stay | 08/01/2016 | R. 32 | 841-860 |
| Notice of Appeal | 08/02/2016 | R. 33 | 861 |
| Order | 08/03/2016 | R. 34 | 862-863 |